**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 1 3 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

M.W., by his parents, S.W. and E.W.,

           Plaintiffs,

- against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

           Defendant.

**MEMORANDUM,
ORDER, AND
JUDGMENT**

11-CV-5846

**Appearances:** ✓

For the Plaintiff:

> Gary S. Mayerson
> Tracy Spencer Walsh
> Mayerson & Associates
> New York, NY

For the Defendant:

> Michael A. Cardozo
> John Buhta
> Corporation Counsel of the City of New York
> New York, NY

**JACK B. WEINSTEIN, Senior United States District Judge:**

### Table of Contents

I.   Introduction ..................................................................................................................... 2
II.  Facts and Procedural History ........................................................................................ 3
      A.   M.W.'s Background and Education ................................................................. 3
      B.   The June 2010 IEP Meeting and the Placement Offer ................................... 3
      C.   IHO Proceedings ............................................................................................. 5
      D.   SRO Proceedings ............................................................................................. 8
      E.   Federal Court Proceedings ............................................................................ 10
III.  Law ............................................................................................................................. 10



     A.    Summary Judgment Standard and Standard of Review in IDEA Context.......... 10
     B.    Individuals with Disabilities Education Act and Relevant State Law ................ 11
        1.    Individualized Education Program Requirement ............................................ 11
        2.    State Administrative Review of IEP Offered .................................................. 13
        3.    Judicial Review of IEP Offered........................................................................ 14
IV.   Application of Law to Facts.................................................................................... 18
     A.    Procedural Adequacy ......................................................................................... 18
     B.    Substantive Adequacy ....................................................................................... 22
     C.    Burden of Proof.................................................................................................. 25
     D.    Appropriate Scope of Reimbursement .............................................................. 25
V.   Conclusion ............................................................................................................. 26

## I.    Introduction

      S.W. and E.W. sued the New York City Department of Education (the "Department") on

behalf of their son, M.W., who has learning disabilities. They contend that the Department failed

to offer M.W. a free appropriate public education, as it was required to do by the Individuals

with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.*

      Plaintiffs seek partial reversal of the decision of a state review officer ("SRO"). The

SRO found that the Department had offered M.W. an appropriate public school education. On

review, the SRO overruled an order of the impartial hearing officer ("IHO"), *see id.* § 1415(f),

who had granted to the parents full funding for special education in a religious school. *See*

Application of the New York City Department of Education, No. 11-70 ("SRO Opinion"), M.W.

et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Feb. 15, 2012), CM/ECF No. 11-3.

      Both plaintiffs and the Department have filed motions seeking summary judgment.

Putting aside sympathy for the plaintiffs' plight and the constitutional question posed by the

IHO's inclusion of the costs of religious education in the initial reimbursement order, the facts,

the law, and the deference given to administrative expertise require that the case be dismissed.

The Department's motion is granted and plaintiffs' motion is denied.

Attached as Appendix A is a glossary of the acronyms used in this opinion and in documents pertinent to the case.

## II. Facts and Procedural History

### A. M.W.'s Background and Education

M.W., a nine-year-old boy, is autistic. *See* Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1 Stmt.") ¶ 1, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Mar. 14, 2012), CM/ECF No. 18. He also suffers from a variety of other ailments, including Tourette's syndrome and attention deficit hyperactivity disorder. *See* Findings of Fact and Decision ("IHO Opinion") 6, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Feb. 15, 2012), CM/ECF No. 11-2. M.W. and his parents have worked with a private therapist for years so that they can integrate into their lives lessons M.W. absorbs at school, as well as strategies to help him regulate his behavior. *See* Def. 56.1 Stmt. ¶ 3.

The child attended the Luria Academy of Brooklyn ("Luria Academy"), a private school that offers religious instruction, during the 2009-2010 school year. *See id.* ¶¶ 2, 57. In January 2010, M.W.'s mother sent an email to a Luria Academy representative. In it, she stated that she was "very interested" in M.W.'s reenrolling at Luria during the following school year, and that she wanted to "secure a spot for him" there. *Id.* ¶ 34. Shortly thereafter, she submitted an application—including a tuition contract—for returning students, reenrolling M.W. at the Luria Academy for the 2010-2011 term. *See id.* ¶ 35.

During the summer of 2010—since the Luria Academy offered a ten-month program—M.W. attended the religious Simcha Day Camp, which did not offer academic instruction. *See id.* ¶¶ 38-40.

### B. The June 2010 IEP Meeting and the Placement Offer

In June 2010, a meeting was held by the committee on special education ("CSE")

responsible for devising M.W.'s Individualized Education Program ("IEP") for the 2010-2011

school year. *See id.* ¶ 5. Participants in the meeting (the "IEP Team") included M.W.'s mother

and his Luria Academy teacher, as well as a school psychologist and a special education teacher

from the Department. *See id.* ¶ 6. Testimony offered before the IHO indicates that the Luria

Academy teacher actively participated in the meeting; M.W.'s mother emphasized at the meeting

the importance of in-school therapy for M.W. and the positive effect that the environment of

Luria Academy had had on her son. *See id.* ¶¶ 7-8. A number of program options were

considered in light of M.W.'s needs. *See id.* ¶ 10. M.W.'s mother had the opportunity to state

her concerns. She did not object to any aspect of the IEP at that time. *See id.* ¶¶ 23-24.

Ultimately recommended for M.W. by the IEP team was a placement in one of the

Department's integrated co-teaching ("ICT") classes—one in which a special education teacher

assists the teacher normally placed in the classroom—on a ten-month basis; the recommended

class had a 12:1 student-teacher ratio. *See id.* ¶ 11 & n.2; IHO Opinion 8-9. The IEP Team also

recommended that M.W. receive the services of a full-time individual behavior management

paraprofessional—an educational assistant responsible for providing concentrated help to a

student—and that M.W. have (1) one thirty-minute session weekly of counseling in a group of

three, (2) three thirty-minute sessions per week of individual occupational therapy, (3) two

thirty-minute sessions weekly of individual physical therapy, (4) two thirty-minute sessions per

week of individual speech and language therapy, and (5) one thirty-minute session each week of

speech and language therapy in a group of two. *See* Def. 56.1 Stmt. ¶¶ 13-14.

The proposed IEP contained goals in a number of subject areas; it offered M.W. the

opportunity to work with a variety of school personnel. *See id.* ¶¶ 17-18. The IEP Team also

developed a behavior intervention plan ("BIP") for M.W. to assist his teachers and paraprofessional in meeting some of his behavioral difficulties; M.W.'s mother had not requested such a plan. *See id.* ¶¶ 19-22.

Offered to M.W. in July 2010 by letter was a placement in an ICT class at a public school located a short distance from the family home. Included in the letter were the school's address and the phone number of a placement officer with whom the parents could discuss the placement offered or request another IEP meeting. *See id.* ¶ 25. The ICT class offered to M.W. was to be co-taught by a special education teacher with thirty years of teaching experience; she communicates daily with the parents of her students. *See id.* ¶¶ 26-27. During the 2010-2011 school year, the school at which M.W. was offered a placement provided numerous workshops for parents to help them deal with the educational needs of their children. *See id.* ¶ 33.

Shortly after the placement offer was made, M.W.'s mother visited the school at which her son had been offered a placement. *See id.* ¶ 36. A short time after the visit, M.W.'s parents informed the Department that they were rejecting the offered placement and that they intended to reenroll their child at the Luria Academy for the 2010-2011 school year. *See id.* ¶ 37.

### C. IHO Proceedings

M.W.'s parents filed an administrative complaint in July 2010 challenging the recommended IEP and the placement offered by the Department. They sought funding for a unilateral placement at the Luria Academy, and for the services of a paraprofessional and a behavioral therapist. *See* IHO Opinion 4. An IHO was designated. In mid-September 2010, the IHO ordered the Department, pursuant to 20 U.S.C. § 1415(j), to provide the parents funding that they had requested until the conclusion of the impartial hearing. *See id.*

The parents filed an amended impartial hearing request in September 2010. They requested an order directing the Department to reimburse them for all Luria Academy tuition costs, as well as the costs of therapy and private paraprofessional services that they had selected on their own. *See* Def. 56.1 Stmt. ¶ 50.

An impartial hearing commenced in August 2010 and concluded in March 2011, after twelve meetings. *See id.* ¶ 51. In May 2011, the IHO Opinion was issued. *See* IHO Opinion 30. The IHO concluded that the Department had failed to offer M.W. a free appropriate public education. It stated that the Department failed to demonstrate the appropriateness of the IEP offered. The IHO found that:

1. Numerous procedural flaws impaired the June 2010 development of the IEP, including:

    a. A lack of discussion of IEP goals, which prohibited M.W.'s mother and his Luria Academy teacher from helping to develop them, *see id.* at 26;

    b. The lack of consideration of the student's current placement at the Luria Academy, *see id.*;

    c. Predetermination of the IEP program that would be offered to M.W., which significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education, *see id.*;

    d. A failure by the CSE to provide M.W.'s mother and his Luria Academy teacher with copies of CSE assessments of the student, *see id.*;

    e. No evidence had been presented by the CSE to support the offered ICT placement in a class larger in size than that to which M.W. was accustomed, *see id.* at 27;

    f. No functional behavior assessment was developed, *see id.* at 28;

6

g. The BIP was developed without parent or teacher involvement, *see id.*; and

2. The IEP and placement offered were substantively inappropriate, according to the IHO, because:

   a. The CSE presented no reason to justify placing M.W. in a 10-month, rather than a 12-month, program, *see id.* at 26;

   b. The Department "presented no documentary evidence to support the appropriateness of the ICT placement," especially in light of M.W.'s delays in developing language and social skills, *see id.* at 27;

   c. No evidence supported the IEP's failure to include adaptive physical education for the student, *see id.* at 26;

   d. The IEP lacked appropriate academic goals, *see id.*;

   e. The IEP was predetermined by the Department, *see id.*;

   f. The IEP "omitted parent training and counseling," *id.* at 27;

   g. The BIP developed for M.W. was inappropriate. *See id.* at 28.

Additionally, the IHO found that the unilateral placement by the parents at Luria Academy, with a paraprofessional, was appropriate, as was the procurement of the services of a therapist by the parents, and that M.W. had demonstrated social and educational progress by virtue of his placement at Luria Academy. It was also determined by the IHO that equitable considerations supported the parents' claim for reimbursement; it was found that M.W.'s mother fully cooperated with the Department, and she testified that she would have considered a public school placement had a free appropriate education been offered. *See id.* at 28-30; Def. 56.1 Stmt. ¶ 56.

Ordered by the IHO was: (1) the repayment by the Department of $14,300 to the plaintiffs for tuition at Luria Academy, with no reduction for time used for religious instruction, (2) reimbursement to M.W.'s parents for funds expended for the services of a therapist and of a paraprofessional who had aided M.W. during the 2010-2011 school year, (3) funding by the Department for M.W.'s continued therapy until July 2011, and (4) reimbursement for the costs of transportation to and from Luria Academy. *See* IHO Opinion 30.

### D. SRO Proceedings

The Department appealed. *See* 20 U.S.C. § 1415(g). The SRO reversed. It was determined that:

1. The IHO should not have addressed the parents' claim of substantive inappropriateness based upon the IEP's failure to recommend adaptive physical education, since that argument was not raised in the parents' due process complaint or before the IHO at oral argument, *see* SRO Opinion 8 (citing 20 U.S.C. § 1415(f)(3)(B));

2. With respect to the parents' claims of procedural inadequacy,

    a. Even assuming that the CSE did not discuss annual goals for M.W. in formulating his IEP, the lack of discussion did not, without more, deny him a free appropriate public education, *see id.* at 10;

    b. M.W.'s mother and his Luria Academy teacher had the opportunity to—and did in fact—actively participate in the IEP process, and that they had the chance to review CSE assessments, *see id.*;

    c. The evidence in the record did not support the IHO's conclusion that the IEP was predetermined, *see id.* at 11;

8

  d. The Department's failure to conduct a functional behavior assessment before developing the BIP did not automatically render the BIP deficient, and, even assuming that the BIP was not discussed at the June 2010 meeting, that failure did not deny M.W. a free appropriate public education, *see id.* at 18-20; and

3. With respect to the IHO's determination that the IEP and placement offered were substantively inappropriate,

  a. The annual goals contained in the IEP "were aligned to the student's needs as described in the evaluative data available to the June 2010 CSE at the time of the meeting," *id.* at 16; *see also id.* at 11-15 (describing the information available to the CSE in June 2010);

  b. The IEP's recommendation for M.W. of a class larger in size than the one his mother had requested—to be supplemented by the services of a full-time behavior management paraprofessional—was appropriate and reasonably calculated to enable him to receive educational benefits, given the related services recommended for him, *see id.* at 16-17;

  c. The Department's failure to provide for parent training in the IEP did not deny M.W. a free appropriate education—though it did not comport with state regulations—since the BIP provided for parent collaboration with M.W.'s teacher and paraprofessional, the school at which M.W. was offered a placement provided parent workshops and in-school counseling for parents, and M.W.'s parents had received training from a private therapist for years, *see id.* at 20-22; and

  d. The Department's offer of a 10-month program did not constitute a denial of a free appropriate public education, since there was insufficient evidence in the

record to suggest that M.W. would have experienced substantial regression during the summer months. *See id.* at 22-23.

The SRO also concluded that the IHO's award of transportation services was not supported by the hearing record. *See id.* at 23.

Since it was determined that the Department had offered M.W. a free appropriate public education for 2010-2011, the SRO did not consider whether the parents' unilateral placement was appropriate or whether equitable considerations favored the parents. Accordingly, the portion of the IHO Opinion requiring reimbursement for Luria Academy tuition and the services of the privately-hired therapist was "annulled." Also reversed was the portion of the IHO opinion requiring payment for transportation services. *See id.* at 24.

### E. Federal Court Proceedings

In December 2011, M.W.'s parents timely commenced an action in this court, seeking reversal of the SRO Opinion. *See* 20 U.S.C § 1415(i)(2)(B); N.Y. Educ. Law § 4404(3)(a). In February 2012, they filed a motion for summary judgment; the Department filed its own summary judgment motion the following month.

Argument on the summary judgment motions was heard in May 2012.

## III. Law

### A. Summary Judgment Standard and Standard of Review in IDEA Context

Summary judgment in the IDEA "context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (internal quotation marks omitted). A district court must base its decision on the preponderance of the evidence and give due weight to the outcome of the state administrative

proceedings. *Id.* (citing 20 U.S.C. § 1415(i)(2)(C)(iii)); *see, e.g., Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005) (describing the "substantial deference" federal courts owe "to state administrative bodies on matters of educational policy"). Deference to the result of the state administrative proceedings "is particularly warranted when the district court's decision is based solely on the administrative record." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007).

If there is a conflict between the original and appellate administrative rulings, deference is due to the state appellate decision. "If a final state determination conflicts with an earlier decision, the earlier decision may be afforded diminished weight." *Id.* at 113 n.2; *see also Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984) (noting that federal courts must "defer to the final decision of the state authorities," even if "the reviewing authority disagrees with the hearing officer").

While the parties may label a dispositive motion filed in an IDEA action one for summary judgment, it is in substance an appeal from a state administrative determination. *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005). The court is not ruling in a typical summary judgment setting. It must determine whether the administrative record and any additional evidence produced demonstrate compliance with the IDEA. *See Wall ex rel. Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 (E.D.N.Y. 1996).

### B. Individuals with Disabilities Education Act and Relevant State Law

#### 1. Individualized Education Program Requirement

"The IDEA is the most recent Congressional enactment in an ambitious federal effort to promote the education of handicapped children." *Gagliardo*, 489 F.3d at 107 (internal quotation

marks omitted). Enacted to effectuate a variety of goals, the statute is intended, *inter alia*, "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for future education, employment, and independent living," and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B).

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'" *Gagliardo*, 489 F.3d at 107 (quoting 20 U.S.C. § 1412(a)(1)(A)). "To meet these requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted).

Services must be administered according to an IEP, which must be reviewed—and revised, if necessary—at least once each year. *See* 20 U.S.C. § 1414(d)(4).

The IEP is the "centerpiece of the IDEA's educational delivery system." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507 (2d Cir. 2006) (internal quotation marks omitted). It is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *Id.* at 507-08 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

Parents who are dissatisfied with the IEP and placement offered are permitted to unilaterally place their child in a private school and then seek the reimbursement of tuition and other expenses from the relevant local educational agency. *See* 20 U.S.C. § 1412(a)(10)(C).

They do so, however, at their own financial risk. *See, e.g., A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

## 2. State Administrative Review of IEP Offered

Pursuant to the IDEA, parents "are specifically entitled to request a due process hearing in order to present complaints as 'to any matter relating to the identification, evaluation, or educational placement of the[ir] child, or the provision of a free appropriate public education.'" *Cave v. East Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(b)(6)(A)).

"New York has opted for a two-tier administrative system for review of IEPs. First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision. That decision can then be appealed to [an SRO] of the New York Education Department." *Id.; see also* N.Y. Educ. Law § 4404(1)-(2). "Only after exhaustion of these procedures has an aggrieved party the right to file a suit in a federal or state court. . . . Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction." *Cave*, 514 F.3d at 245; *see also* 20 U.S.C. § 1415(i)(2).

The IDEA provides that an SRO's review of an IHO decision is *de novo*; the "officer conducting such review shall make an *independent decision* upon completion of such review." 20 U.S.C. § 1415(g)(2) (emphasis added). The relevant New York statute, echoing in substance the standard of review set forth in the IDEA, provides that an SRO reviewing the decision of an IHO "shall review and may modify, in such cases and *to the extent that the review officer deems necessary, . . . any determination of the impartial hearing officer* relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education

13

program or service and the failure to provide such program[,] and require such board to comply with the provisions of such modification." N.Y. Educ. Law § 4404(2) (emphasis added).

This system of review—*i.e.*, the provision of an appellate-level administrative adjudicator possessing the power to modify or set aside the orders of the initial hearing officer without deferring to them—is consistent with general principles of federal administrative law. *See, e.g.*, Richard E. Levy & Robert L. Glicksman, *Agency-Specific Precedents*, 89 Tex. L. Rev. 499, 548 (2011) (noting that in "many agency adjudications, an initial hearing is conducted by an [administrative law judge] or other hearing officer even though the agency itself retains de novo decisional authority").

Pursuant to the court's request at oral argument on the summary judgment motions, letter briefs, providing additional information regarding this issue, were submitted. The authorities cited therein make it clear that the SRO's review of the IHO's determinations is essentially *de novo*. In analyzing a two-tiered administrative review process similar to that of New York, the Court of Appeals for the Third Circuit reached a conclusion supporting the analysis in the instant case. The Third Circuit stated that:

> We . . . hold that appeals panels reviewing the . . . findings of hearing officers in two-tier schemes . . . exercise plenary review, except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion.

*Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995) (Becker, J.). The Third Circuit's conclusion on this point is consistent with the relevant provision of the IDEA, discussed briefly above. *See* 20 U.S.C. § 1415(g)(2).

### 3. Judicial Review of IEP Offered

As noted above in Part III.A, *supra*, in the IDEA context, substantial deference is given by federal courts to the final state administrative determination. *See, e.g.*, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-08 (1982). This is so, at least in part, due to the fact that federal judges generally "lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 208 (internal quotation marks omitted).

Nonetheless, the federal judiciary does have a role in reviewing state administrative determinations in the IDEA context. *See generally* 20 U.S.C. § 1415(i). Compliance with the IDEA is established—that is, a free appropriate public education is offered—if (1) the procedural requirements set forth in the statute are complied with, and (2) the student's IEP is reasonably calculated to enable the child to receive educational benefits. *See, e.g.*, *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192-95 (2d Cir. 2005).

Parents challenging a proposed IEP bear the burden of persuasion as to both the inappropriateness of the IEP offered and the appropriateness of private services obtained. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam). To determine whether parents are entitled to reimbursement pursuant to the IDEA, courts engage in a multistep review process. *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

First, courts are to "examine whether the state has complied with the procedures set forth in the IDEA." *Id.* This inquiry is "no mere formality," since "adequate compliance with the procedures prescribed w[ill] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (internal quotation marks omitted). "However, it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the

IDEA." *A.C.*, 553 F.3d at 172 (internal quotation marks and bracketing omitted). Procedural

errors will not render an IEP inadequate in cases in which the child's educational opportunities

were not affected and if the parents were not deprived of the chance to participate meaningfully

in the development of the IEP. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *Cerra v. Pawling Cent. Sch.

Dist.*, 427 F.3d 186, 192-94 (2d Cir. 2005); *cf. J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60,

69-70 (2d Cir. 2000). Procedures required by the IDEA in the development of IEPs include:

> An opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the
> identification, evaluation, and educational placement of the child, and the
> provision of a free appropriate public education to [the] child, and to obtain an
> independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1); *see also Cerra*, 427 F.3d at 192. Additionally, since the IDEA

"incorporates some but not all state law concerning special education," *Bay Shore Union Free

Sch. Dist. v. Kain*, 485 F.3d 730, 734 (2d Cir. 2007), courts are to consider in their procedural

analysis whether the development of the IEP and the resulting program complied with state law.

*See A.C.*, 553 F.3d at 172 & n.1.

Second, after reviewing a school district's actions for procedural compliance, courts are

to "consider whether the IEP developed through the [IDEA's] procedures is reasonably

calculated to enable the child to receive educational benefits." *Cerra*, 427 F.3d at 192 (internal

quotation marks and bracketing in original omitted). A school district offers a free appropriate

public education "by providing personalized instruction with sufficient support services to permit

the child to benefit educationally from that instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176,

203 (1982). "A school district is not, however, required to furnish every special service

necessary to maximize each handicapped child's potential." *Cerra*, 427 F.3d at 195 (internal

quotation marks omitted). "Rather, a school district fulfills its substantive obligations under the

16

IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student an opportunity greater than mere trivial advancement." *Id.* (internal quotation marks omitted). In determining substantive adequacy, courts must also weigh heavily the statute's requirement that the education of disabled children take place in a minimally restrictive environment; "there is a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *A.C.*, 553 F.3d at 173 (internal quotation marks omitted); *see* 20 U.S.C. § 1412(a)(5).

A "district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan. Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195 (internal quotation marks and citation omitted).

If it is determined that the IEP offered was procedurally and substantively adequate, "the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 192 (internal quotation marks omitted). If, however, the IEP is procedurally or substantively deficient, the court must determine "whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.* "Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate, even if the proposal in the IEP is inappropriate. Nonetheless, parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (citation omitted). Thus,

> [a]n appropriate private placement need not meet state education standards or requirements. For example, a private placement need not provide certified special

17

education teachers or an IEP for the disabled student. In addition, parents may not be subject to the same mainstreaming requirements as a school board. . . .

Subject to the foregoing exceptions, the same considerations and criteria that apply in determining whether [a] School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement. Ultimately, the issue turns on whether a placement—public or private—is reasonably calculated to enable the child to receive educational benefits.

*Id.* (internal quotation marks and citation omitted).

When it is determined that the IEP offered was deficient, and that the parents' unilateral placement was appropriate, the "district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 16 (1993); *Frank G.*, 459 F.3d at 363-64.

## IV. Application of Law to Facts

### A. Procedural Adequacy

Two principal challenges are leveled in plaintiffs' summary judgment papers at the procedure by which M.W.'s IEP was developed. First, the parents contend that the Department's failure to develop a functional behavior assessment deprived M.W. of his right to a free appropriate public education. *See* Plaintiffs-Appellants' Memorandum of Law in Support of Their Motion for Modified *De Novo* Review and For Reinstatement of the Impartial Hearing Officer's Award ("Pl. Mem.") 13-15, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Feb. 15, 2012), CM/ECF No. 13. Second, plaintiffs assert that the Department's proposed IEP was predetermined. *See id.* at 25.

The SRO determined that neither of these procedural challenges required reimbursement. *See* SRO Opinion 10-11 (discussing predetermination), 19 (discussing the lack of a functional

behavior assessment). Deference is due to these determinations. In any event, as noted below, the SRO's conclusions were substantively correct.

It appears from the record—and the Department concedes—that no functional behavior assessment was conducted prior to the June 2010 meeting of the CSE. *See id.* at 19; Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment, Motion to Strike, and in Opposition to Plaintiffs' Motion for Modified *De Novo* Review ("Def. Mem.") 13, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Mar. 14, 2012), CM/ECF No. 17.

New York law in effect at the time of the June 2010 meeting required that individual evaluations of disabled students be performed prior to CSE meetings; these evaluations were required to include, for students "whose behavior impedes his or her learning or that of others," a functional behavior assessment. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v). A functional behavior assessment is defined as "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to that environment"; the end-product of that evaluative process is required to include "the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and the probable consequences that serve to maintain it." *Id.* § 200.1(r).

The Court of Appeals for the Second Circuit has stated that the violation of this regulation in the development of an IEP "does not compel the conclusion" that the IEP developed was "legally inadequate," so long as the government complies with its obligation—in the case of a child whose behavior impairs his or her learning or that of others—to "'consider the use of positive behavioral interventions and supports, and other strategies, to address that

behavior.'" *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009) (quoting 20 U.S.C. § 1414(d)(3)(B)(i)). Noted in *A.C.* was the fact that "the sufficiency of [a school district's] strategies for dealing with [disruptive] behavior is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Id.* (internal quotation marks omitted).

The IEP and BIP developed for M.W. demonstrate that the Department, despite its failure to conduct a functional behavior assessment, complied with the IDEA. The IEP noted that positive reinforcement was needed to deal with M.W.'s behavior and that a BIP was required; the BIP developed and attached to the IEP included strategies that were to be utilized to encourage positive behavior on the part of the student. *See* Individualized Education Program 4, 19, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Apr. 19, 2012), CM/ECF No. 26-21.

The Department's failure to conduct a functional behavior assessment was not detrimental to M.W. This lapse provides no basis for the conclusion that M.W. was deprived a free appropriate public education.

Plaintiffs' other contention to which they devote substantial argument—that the IEP developed for M.W. was predetermined—similarly provides no basis for reimbursement. The transcript of the IHO hearing indicates that all members of the IEP team, including M.W.'s mother, participated actively in the development of M.W.'s IEP. *See* Tr. of Dec. 16, 2010 Hr'g 382, 383, 415-16, 428, 432, 434, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Apr. 19, 2012), CM/ECF No. 26-15. The hearing record also indicates that a number of potentially appropriate program options were considered for M.W. No one precluded M.W.'s mother from participating fully in the June 2010 meeting. *See id.* at 435-37; Tr. of Mar. 10, 2011

Hr'g 1088, 1098-99, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Apr. 19, 2012), CM/ECF No. 26-19. In short, the fact that the Department participants in the June 2010 meeting were prepared for the discussion does not mean that the IEP developed for M.W. was predetermined. *See, e.g., Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610-11 (6th Cir. 2006). On the contrary, it was a sign of the seriousness with which they viewed their task.

It should also be noted that plaintiffs' predetermination argument is belied by the fact that M.W.'s mother, who attended the June 2010 IEP meeting, is a certified special education teacher. *See* Def. 56.1 Stmt. ¶ 4. Given that expertise, it is likely that she took an active role in discussing the child's IEP. M.W.'s mother failed to appear in court to be questioned about her participation in the IEP meeting. This failure violated the court's order requiring her to appear. *See* Order, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Mar. 27, 2012), CM/ECF No. 20. The two family members who did appear for the plaintiffs had knowledge only of financial details and not of the development of the child's IEP. Plaintiffs' claim that M.W.'s mother was not afforded the chance to participate in the development of the child's IEP is rejected as contrary to the facts.

At oral argument, plaintiffs raised for the first time the procedural argument that the Department had failed had to conduct a threshold evaluation of M.W. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b). Even assuming without deciding that this argument has not been forfeited by plaintiffs' failure to raise it in their moving papers, *see, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008), it is without merit. The SRO's opinion indicates that substantial information regarding M.W.'s background was available to and was utilized by the CSE at the June 2010 meeting. *See* SRO Opinion 11-12.

Any failure to conduct an additional evaluation did not affect M.W.'s educational opportunities or impair his parents from participating in the development of the IEP.

## B. Substantive Adequacy

Plaintiffs challenge the substantive adequacy of the IEP, offering three principal arguments. They contend that the IEP offered was substantively inadequate since (1) the Department failed to offer a 12-month program for M.W., (2) the IEP did not provide for parent counseling and training, and (3) the class in which M.W. was offered a placement was too large in size for his needs. None of these contentions have merit.

With respect to plaintiffs' first argument, the relevant New York regulation provides that students "shall be considered for 12-month special services and/or programs in accordance with their need to prevent substantial regression," if certain criteria are met. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(k)(1). "Substantial regression" is defined to mean "a student's inability to maintain developmental levels due a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year." *Id.* § 200.1(aaa).

Plaintiffs' argument that the Department erred by not offering M.W. a 12-month educational program is belied by their own voluntary enrollment of M.W. in a private 10-month, rather than a 12-month, program after their rejection of the IEP. *See* Def. 56.1 Stmt. ¶¶ 37-38. Also weighing against plaintiffs' position is the fact that M.W.'s mother explicitly stated at the IHO hearing that reimbursement for a 10-month program, rather than 12-month program, was sought. *See* Tr. of Mar. 10, 2011 Hr'g 1109. Given plaintiffs' actions indicating that a 10-month

program was appropriate for M.W., deference to the SRO's determination on this point is particularly appropriate. *See* SRO Opinion 22-23.

Notable with respect to this argument of plaintiffs is the fact that the child was sent by the parents for two months to a summer camp, the Simcha Day Camp, during the summer of 2010. *See* Def. 56.1 Stmt. ¶ 39. At the hearing in this court, it was argued by the plaintiffs that the child did receive some extra educational help at the camp. *See* Tr. of May 15, 2012 Hr'g. Assuming this was the case, it does not suffice to show that M.W. would have experienced substantial regression without such instruction, or that the Luria Academy's ten-month program was more efficacious than the public school's ten-month program.

There is no substantial evidence in the administrative record suggesting that M.W. would have experienced substantial regression during the summer months had the parents accepted the offered IEP program. *See* SRO Opinion 23. Plaintiffs had the burden of persuasion on this point. *See, e.g., T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).

The IEP's failure to recommend parent counseling and training also does not provide a basis for reimbursement. New York's regulations require that in the development of IEPs for autistic children, "[p]rovision shall be made for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d). IEPs are required to state "the extent to which the student's parents will receive parent counseling and training . . . , when appropriate." *Id.* § 200.4(d)(2)(v)(b)(5).

The Court of Appeals for the Second Circuit has ruled that the failure of an IEP to provide for parent counseling and training does not necessarily render an IEP substantively

deficient. *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009). M.W.'s IEP states that "[t]he teacher, para[professional] and parent[s] will collaborate to implement and reinforce the desired behaviors." Individualized Education Program 19, M.W. et al. v. N.Y.C. Dep't of Educ., No. 11-CV-5846 (E.D.N.Y. Apr. 19, 2012), CM/ECF No. 26-21. The school at which M.W. was offered a placement provided numerous workshops and other opportunities to help train parents and to assist them in dealing with their child's educational needs. *See* Def. 56.1 Stmt. ¶ 33. Given the opportunities that were offered for the parents, and considering the mother's professional ability to evaluate and take advantage of them, deference is appropriate to the SRO's conclusion on this point, *i.e.*, that the failure of the IEP to explicitly provide for parent training did not render it substantively inadequate. *See* SRO Opinion 20-22.

Plaintiffs contend additionally that the class in which M.W. was offered a placement was "way too large . . . (especially considering that he would not have a one-to-one aide)." Pl. Mem. 22. The IEP proposed that M.W. receive the services of two teachers and a full-time paraprofessional. That the size of the class in which M.W. was offered a placement was larger than his parents desired does not mean that the placement was not reasonably calculated to provide educational benefits. The extensive extra help to be offered individually and in small groups to M.W. was well designed to meet his educational needs. Deference is due to the SRO's conclusion that the IEP's recommended ICT class did not deny M.W. a free appropriate public education. *See* SRO Opinion 16.

Raised for the first time at oral argument was the contention that the Department failed to offer M.W. an education in a minimally restrictive environment, *i.e.*, one in which he would be educated with non-disabled children to the maximum extent appropriate. *See* 20 U.S.C. § 1412(a)(5). Assuming that this argument was not forfeited by the failure to raise it in the

summary judgment papers, it is without merit. The IEP offered to M.W. provided for his placement in a class of 23 students, one-third of whom had IEPs. *See* SRO Opinion 16. The Department complied with the statute's mainstreaming requirement. *See P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 120-21 (2d Cir. 2008).

### C. Burden of Proof

Plaintiffs' last argument raised in their summary judgment papers—that the SRO improperly shifted the burden of proof onto them from the Department—is not an attack on the adequacy of the IEP offered. In any event, it is without merit. "The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).

Since M.W. and his parents challenged the IEP offered, they bore the burden of persuasion. That the IHO initially decided the dispute adversely to the Department does not mean that the burden of proving adequacy shifted to the Department when an appeal was taken to the SRO, just as an appeal in a judicial proceeding does not serve to shift the burden of proof to an appellant with respect to a claim on which the appellee bore that burden in the trial court.

In any event, were the burden placed on the Department, the outcome of the instant case would remain the same.

### D. Appropriate Scope of Reimbursement

At the hearing held on the summary judgment motions, plaintiffs admitted that a portion of their request for tuition reimbursement was improperly sought. *See* Tr. of May 15, 2012 Hr'g. This inappropriate request included expenditures for religious education. In view of the

25

dismissal of the case, there is no need to determine whether the other educational expenditures made by the parents were justified.

## V.    Conclusion

Plaintiffs' contentions are without merit. The IEP offered to M.W. was devised in a procedurally sound fashion. It was reasonably calculated to provide the statutorily-required educational benefit.

Given these conclusions, it need not be determined whether the parents' unilateral placement of M.W. at the Luria Academy was appropriate, or whether equitable considerations support the parents' claim for reimbursement. Nevertheless, the record suggests that the equities favor the Department and not the plaintiffs.

Plaintiffs' motion for summary judgment is denied. The defendant's motion for summary judgment is granted, and its motion to strike is denied. No costs or disbursements are awarded.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:    June 11, 2012
         Brooklyn, New York

**APPENDIX A: GLOSSARY OF ACRONYMS**
**M.W. ET AL. v. NEW YORK CITY DEPARTMENT OF EDUCATION**
**NO. 11-CV-5846**

- BIP: Behavior Intervention Plan. *See* 20 U.S.C. § 1414(d)(3)(B)(i); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(3)(i).

- CSE: Committee on Special Education. *See* N.Y. Educ. Law § 4402(1)(b)(1).

- FAPE: Free Appropriate Public Education. *See* 20 U.S.C. § 1401(9). (This acronym was used extensively in the briefs and at oral argument, but it is not used in the court's memorandum, order, and judgment.)

- ICT: Integrated Co-Teaching. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g).

- IDEA: The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*

- IEP: Individualized Education Program. *See* 20 U.S.C. § 1414(d).

- IHO: Impartial Hearing Officer. *See* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1).

- SRO: State Review Officer. *See* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).